| | |
|---|---|
| BRIAN VUKADINOVICH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     **2:13-cv-00144-PPS** |
| | ) |
| HANOVER COMMUNITY SCHOOL | ) |
| CORPORATION, BOARD OF TRUSTEES | ) |
| OF HANOVER COMMUNITY SCHOOL | ) |
| CORPORATION, Former Superintendent | ) |
| CAROL A. KAISER, Principal JUSTIN | ) |
| BIGGS, Trustee MARY JOAN DICKSON, | ) |
| Trustee JULIE MUELLER, Former Trustee | ) |
| PAT KOCOT, Former Trustee DANA | ) |
| GRINER and TONY HIATT | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Plaintiff Brian Vukadinovich, representing himself, has moved for partial summary judgment, and his former employer the defendants Hanover School (along with certain named school employees and trustees) have filed a cross-motion for summary judgment. This Order has been a long time coming because, in addition to those motions, the parties have filed more than 10 peripheral motions and thousands of pages of evidence. But this over-litigated case is, at bottom, a simple single-plaintiff employment dispute which alleges age discrimination and retaliation, constitutional claims under § 1983, and state claims for breach of contract and violation of state laws relating to public employment.

Vukadinovich taught at Hanover Schools for eight years, until his employment ended in June 2012. He alleges that his contract was not renewed due to his age (60) and in retaliation for his successful settlement two years before in a lawsuit against his previous employer, the Hammond Schools. He also alleges that he was not afforded a meeting with the School's governing body, in violation of his constitutional due process rights, as well as in violation of his contract and state law.

Vukadinovich seeks partial summary judgment on his due process claim (DE 279.) He attached a mountain of documents he feels support his motion, although some documents appear twice in that filing. (DE 281.) The School defendants (as I'll call them, because they all have the same attorneys and have acted jointly in this case) also seek summary judgment. (DE 285.) This Order will address the motions for summary judgment. It will then go on to address the rest of the pending motions to clear the docket and allow this case to move forward to disposition.

## BACKGROUND

Vukadinovich worked for Hanover Schools for eight school years, from August 2004 through June 2012. By 2012 he was a teacher of permanent status with, he alleges, an exemplary work record, positive evaluations, and no disciplinary actions. (DE 54, 46-1 at 3, 10; DE 318 at 68-69.) He taught three middle school classes in a program called "Project Lead the Way" for which Vukadinovich was certified. (DE 284 at 2.) Vukadinovich's amended complaint alleges that School Principal Justin Biggs informed Vukadinovich by letter in May 2012 that Biggs had made a preliminary decision to

discontinue Vukadinovich's teaching contract at the end of the 2011-2012 school year. The letter was a mess – it cited the wrong section of the applicable Indiana statute, and it told Vukadinovich that he could request a meeting with the superintendent which, as we will see, the statute doesn't actually require. (DE 281-4 at 49.)

The letter stated that the reason for the nonrenewal of the contract was a "reduction in force." *Id.* Vukadinovich alleges that this was a pretext, and Biggs actually made this decision based on Vukadinovich's age and in retaliation over his July 2010 settlement in a case against Hammond Schools. One might wonder why the principal of Hanover Schools would care about a settlement with some other school system, but as it turned out, the principal in question, Biggs, worked at the Hammond Schools at the time of the settlement. According to Vukadinovich, when Biggs told him his contract was not being renewed, Biggs referenced the Hammond settlement and called Vukadinovich an "old man." (*See* DE 281-5, EEOC Charge; DE 294 at 5, Affidavit of Brian Vukadinovich.) In particular, according to Vukadinovich, when delivering him the news about his nonrenewal, Biggs said that "I hope you saved some of that money from the Hammond School settlement," and "I have friends in School City of Hammond, you know," and "Did you really think there would be no price to pay?" and "I hope you saved some of that settlement money *old man*"(DE 54 at 9, Complaint (emphasis in Complaint).)

Vukadinovich says he was the only fulltime teacher at Hanover Schools to be non-renewed at the end of the 2011-2012 year so it wasn't much of a "reduction in

force" — if it was one at all. (Vukadinovich attached the School bylaws on reduction in force, but the edition was revised on 10/9/12, so it's unclear whether they were in effect at the time of Vukadinovich's non-renewal. [DE 281-5 at 69.]) The classes he taught were not offered the year after his contract was not renewed.

Vukadinovich requested a meeting with the superintendent, and that meeting was held on May 11, 2012. The superintendent at the time was a woman named Carol Kaiser. There don't appear to be detailed records of that meeting, but Vukadinovich asked Kaiser about the meeting during her deposition. When asked the open-ended question "did you give me any information at that meeting at all?," Kaiser said she did not recall. (DE 318 at 49.) Steve Landis, another teacher, also attended the meeting (it seems that Vukadinovich brought him). (DE 318 at 71-72.) During the meeting, Principal Biggs walked in but was told to leave (DE 318 at 72-76).

At her deposition, Vukadinovich asked Kaiser about the substance of the meeting. In particular, he had asked her for specific statistics about enrollment and the number of students he would have to get into a class to avoid being a casualty of the reduction in force, and she did not give him statistics, saying "there is no magic number." (DE 318 at 77.) Although Vukadinovich's non-renewal was based on a supposed reduction in force, the overall number of teachers went up. (*Id*.) Kaiser remembered that another teacher was permitted to make announcements and post fliers about his courses, but didn't recall if Vukadinovich asked her at the meeting to let him do the same thing. (DE 318 at 77-78.) She thought he had asked her in writing to let him

do that, and she then reviewed a post-meeting e-mail from Vukadinovich in which he asked her to let him do that. (DE 318 at 80.) She did not recall ever responding to that e-mail. (DE 318 at 82.) Vukadinovich then took Kaiser through various exhibits that seemed to show classes with low enrollment, but there's no suggestion that these classes bore any relation to Vukadinovich's classes. (DE 318 at 85-92.)

After the meeting with the superintendent, Vukadinovich did send an e-mail to the superintendent, copied to the board members, confirming that he was told at the meeting that the problem was that not enough students were taking his classes. But despite his request, he was never told what number would be enough to stave off his termination. He wrote in his e-mail that he hadn't heard evidence that convinced him of the appropriateness of his contract not being renewed on the basis of a reduction in force. (DE 281-5 at 30.)

Vukadinovich alleges that a younger teacher whose classes were under-enrolled at the same time was offered opportunities to advertise his classes that weren't offered to Vukadinovich. (DE 54 at 12; DE 281-5 at 31-35.) The defendants note that, while the classes and teaching qualifications appear similar, Vukadinovich was not actually qualified to teach the classes that the younger teacher taught (graphic design and layout, and graphic imaging technology). (DE 286 at 12-14.)

The superintendent told the School board that Vukadinovich should be non-renewed because of a justifiable reduction in force, with the further related explanation that Vukadinovich's classes were under-enrolled. (DE 54 at 11; DE 281-4 at 50.) The

superintendent's letter to the board included the same incorrect statute as the letter to Vukadinovich (although both correctly stated that the basis was a justifiable decrease in the number of teaching positions).

Vukadinovich alleges that the School then added procedural injury to the substantive injury of nonrenewal when the Board of Trustees refused his request for what he believed to be a statutorily mandated meeting. (DE 54 at 13; DE 281-4 at 51.) The School administration responded that "I.C. 20-28-7.5 does not provide a statutory right to a private conference with the Board for a teacher who is being declined via the non-continuation of contract statutory process." (DE 281-4 at 52.)

Vukadinovich's procedural claims arise under both state and federal law: Vukadinovich alleges breach of contract based on his termination for a reason not allowed under the contract, and for the School's denial of a meeting with the governing body as set out in his contract. (DE 54 at 17.) Along these same lines, Vukadinovich argues that the School didn't comply with state law, Ind. Code 20-28-7.5, which requires the School to afford a meeting with the governing body to a teacher terminated as part of a justifiable reduction in force. (DE 54 at 18.) These really raise the same issues as one another because a teacher's contract is written pursuant to state law and the procedure applicable to a teacher's employment. If the State afforded him rights, then the denial of those rights could also qualify as a denial of his constitutional due process right.

The board ultimately voted to approve the principal's and the superintendent's recommendation that Vukadinovich's contract not be renewed due to a reduction in

force. There is evidence that at least one board member sought additional information about Vukadinovich's non-renewal, but the superintendent did not provide as much additional information, or perhaps didn't do it as quickly, as the board may have liked. (It's difficult to say for certain because it's apparent from the deposition transcripts that the deponents' memories of the details are hazy.) (DE 318 at 32-33, 39-41.) Board member Mary Joan Dickson said that the board's established procedure for reducing staff levels was to "take[] advice from the attorney and the superintendent. That is our job to take their recommendations and act on them." (DE 281-7 at 17 (Deposition Transcript at 75).) Vukadinovich asked her if part of their procedure was getting the teacher's side of the story and she said, "At that time it was not part of the procedure." (DE 281-7 at 17.)

Vukadinovich seems to assert a claim via 42 U.S.C. § 1983 that the individual defendants violated his rights by not getting trained. In making this conclusory allegation in his amended complaint, he conflates individual and institutional liability, as well as personal versus policy liability, under section 1983. I will read this training claim as Vukadinovich's avenue to hold the School responsible for the constitutional wrongs he alleges against the individuals. This claim is along the same lines as his claim that the School had a general practice of flouting the law. He quotes an e-mail among administrators in which one wrote, "Of course, for 'political reasons' you can ignore

any law that stands in your way or at least distort it!!!….right?"[1] (DE 54 at 15; DE 281-6 at 1.) Reading the amended complaint liberally, Vukadinovich seems to want to use the alleged policy announced in that email to hold the School liable for any wrong that may have befell him.

The defendants moved for summary judgment on all of Vukadinovich's claims: age discrimination, retaliation, the state law claims, the constitutional due process violation, and the section 1983 violations. (DE 285.) Vukadinovich moved for summary judgment on the due process issue. (DE 279.)

---

[1] Vukadinovich is fond of quoting this bizarre comment from an e-mail the main content of which is apropos of nothing, at least with respect to Vukadinovich or the current case. The comment is at the end of an e-mail among administrators saying that Indiana law requires schools to "have a media program that is an integral part of the educational program." (DE 281-6 at 1.) I can't help but comment that this might actually bear on why the school allowed the younger teacher whose classes were underenrolled to advertise, but didn't offer the same to Vukadinovich – the other teacher's classes had to do with computer graphics and design, which might have satisfied this "media program" statute. Vukadinovich taught "industrial arts" and "industrial technology" classes, which he described as the new names for what "they used to call [] shop classes." (DE 318 at 99.)

**DISCUSSION**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material facts exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, I must construe all facts and draw all reasonable inferences from the record in the light most favorable to the nonmoving party. *Id.* at 255. But the nonmoving party is not entitled to the benefit of "inferences that are supported by only speculation or conjecture." *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (quotation marks and citation omitted).

1.     **Age Discrimination and Retaliation**

The defendants argue that Vukadinovich can't prove age discrimination or retaliation based on his settlement of a prior lawsuit against Hammond Schools. In reality, Vukadinovich has direct evidence of both claims. I'll take up the age discrimination claim first and then move to the claim of retaliation.

The ADEA makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age."  29 U.S.C. § 623(a)(1); *see, e.g.*, *Martino v. MCI Communs. Servs.*, 574 F.3d 447, 452 (7th Cir. 2009). The ADEA sets a high bar: the plaintiff must prove by a preponderance of the

evidence that age was the but-for factor — not simply a motivating factor — behind the adverse employment action. *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 177-78 (2009). To prevail on a discrimination claim under the ADEA, Vukadinovich may proceed under either the direct or indirect method of proof. *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012); *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). Under the direct method, a plaintiff must present direct and/or circumstantial evidence that "points directly to a discriminatory reason for the employer's action." *Fleishman*, 698 F.3d at 603.

For starters, it's rather apparent that Vukadinovich and Biggs, the principal, simply did not get along. (*See, e.g.*, DE 281-5 at 10-14, 19, 26-28, 29-30.) On the other hand, there's also strong and consistent testimony that the reason for cutting Vukadinovich's courses was a lack of enrollment. And the School of course is entitled to decide what classes it wants to offer. The problem for the defendants is Vukadinovich's allegation (which I take as true at this point because he is the nonmoving party) that, as he handed Vukadinovich the letter that was basically a pink slip, Principal Biggs called Vukadinovich an "old man" and made comments, including that he "hope[d] [Vukadinovich] saved some of that money from the Hammond School Settlement." (DE 54 at 9.) With nothing in the defendants' briefing citing information directly from Biggs, this isn't even a he-said/he-said situation; it's just he-said. So Vukadinovich has direct evidence of discrimination.

The defendants cast these comments as mere workplace ribbing, or stray remarks. This ignores the body of Seventh Circuit law related to the timing of such

unfortunate comments. For instance, in addressing the subject in *Fleishman v. Cont'l Cas.*

*Co.*, the Seventh Circuit wrote:

> [I]solated comments are not probative of discrimination unless
> they are "contemporaneous with the discharge or causally
> related to the discharge decision-making process." *Gleason v.
> Mesirow Fin., Inc.*, 118 F.3d 1134, 1140 (7th Cir. 1997). This
> comment is not contemporaneous because it came ten months
> before Fleishman's termination. *See Markel v. Bd. of Regents of
> Univ. of Wis. Sys.*, 276 F.3d 906, 910-11 (2001) (two months before
> termination not contemporaneous); *Kennedy v. Schoenberg, Fisher
> & Newman, Ltd.*, 140 F.3d 716, 724 (7th Cir. 1998) (five months
> not contemporaneous). More importantly, there is no
> connection between it and the termination decision. Fleishman
> fails to explain how this comment relates to Continental's
> decisions, when the record reflects a clear, causally connected
> chain of events beginning with Husnik's and others' complaints
> about Fleishman's work, leading to Izzo's investigations into
> these concerns, and ending with Izzo's decision to terminate
> Fleishman for inadequate performance. *See Marshall v. Am.
> Hosp. Ass'n*, 157 F.3d 520, 526 (7th Cir. 1998) (requiring plaintiff
> to connect noncontemporaneous comments to the employer's
> decision).

*Fleishman*, 698 F.3d at 605. Here, Biggs made the ageist comments at the very moment

he terminated Vukadinovich.

The defendants argue that Biggs didn't make the final decision, which removed

the causal connection between the discriminatory comment and the adverse action. (DE

286 at 10, citing *Sun v. Board of Trustees of the University of Illinois*, 473 F.3d 799, 813 (7th

Cir. 2007) (quoting *Willis v. Marion Cnty. Auditor's Office*, 118 F.3d 542, 547 (7th Cir.

2007)).) But the defendants don't explain the nonrenewal process. Frankly, based on

what I've read in this case, it appears to me that the decision to not renew Vukadinovich

was set in motion *by Biggs*, and it wouldn't have happened without his push. There's no evidence that Superintendent Kaiser or the board were champing at the bit to get rid of Vukadinovich. Yes, the superintendent met with Vukadinovich and could have declined to recommend non-renewal to the board, but there's no information about policy and how likely that was to happen. The same goes for the board's vote. Without that information I can't say that Biggs wasn't the cause of Vukadinovich's termination. The burden of proof is ultimately on Vukadinovich, but at this point I have to construe facts in his favor because he's the nonmoving party.

At the very last, Vukadinovich has a cat's-paw argument for causation because there is no evidence that Kaiser or the board did their own thorough analysis of the decision — they relied on Biggs. *See, e.g., Martino v. MCI Communs. Servs.*, 574 F.3d 447, 452-453 (7th Cir. 2009) ("The company can defeat this tack – what we call the cat's paw theory – by showing that, even if Gross was biased and attempted to get Martino terminated for this reason, the decisionmaker did an independent analysis and came to his own conclusion.")

Let's move now to the retaliation claim. The analysis is the same. The background to Vukadinovich's retaliation claim can be found in the earlier lawsuit he filed against his previous employer, the School City of Hammond. That case was handled by Judge Van Bokkelen. *See, Vukadinovich v. School City of Hammond*, 2:10-cv-00257-JVB-APR, filed June 24, 2014, terminated Nov. 16, 2010. Vukadinovich claims in this case that Biggs was still steamed in 2012 about Vukadinovich settling that case

12

against the Hammond Schools, where Biggs happened to work when Vukadinovich got the settlement. That case, too, claimed age discrimination, along with national origin discrimination under Title VII. (Case No. 2:10-cv-00257, DE 76 at 1-2.)

"[T]he ADEA prohibit[s] employers from retaliating against employees who exercise their rights under those statutes. In order to prove a claim of retaliation, the employee must show (1) he engaged in a statutorily protected activity; (2) he suffered an adverse action; and (3) a causal connection between the two." *Silk v. Bd. of Trs.*, 795 F.3d 698, 710 (7th Cir. 2015) (quotation marks, citation omitted). The defendants agree that Vukadinovich engaged in statutorily protected activity by filing the lawsuit against Hammond.  And they also agree that he suffered from an adverse employment decision — his contract was not renewed. What they take issue with is whether there is any evidence connecting those two things.  *See, e.g.*, *Greengrass v. Int'l Monetary Sys., Ltd.*, 776 F.3d 481, 485 (7th Cir. 2015). In other words, the School claims there is no evidence of a causal connection.

To accept the School's argument is to ignores what Vukadinovich claims was said to him when he was sacked.  Recall that Vukadinovich claims that when Biggs delivered him the news about the nonrenewal, Biggs made a comment about the earlier settlement with Hammond: "I hope you saved some of that money from the Hammond School settlement," and "I have friends in School City of Hammond, you know," and "Did you really think there would be no price to pay?" and "I hope you saved some of that settlement money, **old man**." (DE 54 at 9, Complaint (emphasis in Complaint).)

13

The defendants say the two-year gap from the time of the Hammond settlement and Biggs' comment and the fact that the board ultimately voted to not renew Vukadinovich's contract sever any causal connection. This makes no sense.  The important question from a timing point of view is the amount of time that elapsed from when Biggs made his threatening comments not how much time elapsed from when Hammond case was settled.  Here, the threatening comments and the adverse action were simultaneous. So, taking Vukadinovich's statements as true, Biggs' comments directly link Vukadinovich's non-renewal to the Hammond Schools' case. In Biggs' words, it was the "price to pay" for the Hammond settlement. And also, as with the age discrimination claim, with respect to causation, the School hasn't shown that Biggs' decision not to renew the contract wasn't all but final in either a literal or cat's-paw sense.

Because Vukadinovich may be able to convince a reasonable jury that his contract was not renewed based on his age or in retaliation for his successful discrimination lawsuit against Hammond Schools, the defendants' motion for summary judgment on the ADEA claim and the retaliation claim are **DENIED**. Under the cat's-paw theory, at least, a jury could impose liability against the School.  So these claims will continue against the School and the Board. But because the individual defendants are not "employers" under the ADEA, the age discrimination and retaliation claims will be dismissed against them. *Horwitz v. Board of Education of Avoca School Dist. No.* 37, 260

F.3d 602, 610, n. 2 (7th Cir. 2001); *O'Reagan v. Arbitration Forums, Inc.*, 121 F.3d 1060, 1066, n. 8 (7th Cir. 1997).

### 2. Due Process Claims

Vukadinovich and the defendants both seek summary judgment on the due process claim, which encompasses interrelated state and federal claims. Vukadinovich primarily argues that Indiana law required the Board to meet with him. But he also argues that their decision to cancel his contract, without giving him a chance to tell his side of the story and without reviewing enough information, was a violation of his constitutional due process rights. (*See, e.g.*, DE 280 at 13, 18, 21.) Federal due process turns on this property interest. In order to deprive someone of a property interest, the Constitution requires that they be afforded adequate due process. *See, e.g.*, *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542 (1985).

First off, "Defendants agree that the Plaintiff had a property interest in his employment by virtue of both the Indiana statutes and his contract." (DE 284 at 10.) This is undoubtedly correct. *See, e.g.*, *Stewart v. Ft. Wayne Community Schools*, 564 N.E.2d 274, 280 (Ind. 1990) ("[W]e believe that her statutory status as a tenured teacher does vest in her a property interest in her job that entitles her to the protections afforded by substantive due process.").

As far as notice goes, Vukadinovich wanted statistics about enrollment as part of the notice – he wanted the School to justify its decision to him. But there's no suggestion that the sloppy drafting of the letter and the citation to the wrong code section threw

him off when it came to actually understanding the basis for his nonrenewal. His e-mail after the meeting with Superintendent Kaiser indicated that he understood that his contract wasn't being renewed due to a reduction in force. His asking for enrollment numbers and permission to advertise his course offerings to would-be students shows that he understood that the reduction in force decision was related to course content and enrollment numbers. (*See* DE 318 at 111-12.) So there is no question that Vukadinovich received actual notice of the impending adverse employment action and the purported basis for it.

The termination of an Indiana public school teacher's employment is governed by Indiana Code § 20-28-7.5. Sub-section 2 addresses the rights of a teacher with respect to private conferences:

> (a) Before a teacher's contract is canceled, the teacher has the following rights:
>> (1) The principal shall notify the teacher of the principal's preliminary decision. The notification must be:
>>> (A) in writing; and
>>> (B) delivered in person or mailed by registered or certified mail to the teacher at the teacher's last known address.
>> (2) The notice in subdivision (1) must include a written statement, subject to IC 5-14-3-4, giving the reasons for the preliminary decision.
>> (3) Notification due to a reduction in force must be delivered between May 1 and July 1.
> (b) For a cancellation of a teacher's contract for a reason other than a reduction in force, the notice required under subsection (a)(1) must inform the teacher that, not later than five (5) days after the teacher's receipt of the notice, the teacher may request a private conference with the superintendent. The

superintendent must set the requested meeting not later than
ten (10) days after the request.

Burns Ind. Code Ann. § 20-28-7.5-2.

The rest of the sub-section lays out conference procedures for situations in which the teacher is entitled to and requests a conference with the superintendent: the teacher may bring a representative, the superintendent shall make a recommendation to the governing body after the conference, and if the teacher doesn't request a superintendent conference then the principal's preliminary decision is final. After the conference with the superintendent, a teacher can request a conference with the governing body that will make the final decision. *Id.* at (c)-(f). Under § 20-28-7.5-3, the governing body may vote on cancellation of a contract at the first public meeting after a teacher's private conference with the superintendent or governing body, as applicable. A teacher's contract "continues in force on the same terms and for the same wages . . . for the next school term following the date of the contract's termination unless one (1) of the following occurs: (1) The school corporation refuses continuation of the contract under this chapter." Ind. Code § 20-28-7.5-6.

The statute above lays out the procedural requirements. "If the procedural requirements are followed, including the assignment of a legal cause for cancellation of the contract, and if there is substantial evidence presented which tends to support  the legal cause, and if the hearing is, in fact, fair, the proceeding is lawful." *Stewart*, 564 N.E.2d at 277(quotation marks, brackets, citation omitted).

The issue of whether Indiana state law was followed here requires statutory interpretation.[2] "As with any question of statutory interpretation, our analysis begins with the plain language of the statute. It is well established that, when the statutory language is plain, we must enforce it according to its terms." *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) (citations omitted). When considering an Indiana law:

> [W]e must interpret the statute as we think the Indiana Supreme Court would interpret it. In Indiana, the lodestar of statutory interpretation is legislative intent, and the plain language of the statute is the best evidence of that intent. Unless a statute indicates otherwise, we must give the words in the statute their plain and ordinary meaning, and we must examine the statute as a whole, avoiding both excessive reliance on strict literal meaning and selective reading of individual words.

*United States v. Mohamed*, 759 F.3d 798, 804 (7th Cir. Ind. 2014) (citations, ellipsis, quotation marks omitted.)

The first part of section 20-28-7.5-2,[3] subsection (a), addresses notice requirements, including the timing of a notice of non-renewal due to a reduction in force; Vukadinovich does not contest that his notice was timely or that he didn't understand the basis for his non-renewal. Subsection (b) says that for cancellation of a

---

[2] The parties did not cite any cases explicating the application of I.C. § 20-28-7.5-2, and the defendants specifically noted that the statute has only been in effect since 2011, so there are no reported cases construing these laws in their current form. (*See* DE 284 at 7.)

[3] The defendants argue about the difference between cancellation versus non-renewal of a contract. That's a more difficult distinction to draw, and I'd rather leave that for the Indiana courts. Vukadinovich's due process claim doesn't relate to the wording of the reason for his non-renewal – it was reduction in force, that's not in question - but rather relates to the notice and opportunity-to-respond requirements.

contract "for a reason *other than a reduction in force*" (emphasis added), the notice must inform the teacher that he may request a private conference with the superintendent. So this subsection doesn't confer a right to a private conference with the superintendent for a teacher not being renewed based on reduction in force, which means it didn't confer such a right on Vukadinovich. Subsection (c) says the teacher can bring a representative to the superintendent conference; this obviously only applies to teachers entitled to a superintendent conference. Subsection (d) requires the superintendent to make a written recommendation to the governing body after the conference. Subsection (e) says that if the teacher doesn't request a superintendent conference, the principal's decision is final. Finally, subsection (f) says that a teacher "is entitled to an *additional* private conference with the governing body before the governing body makes a final decision," so long as the teacher requests such a conference "not later than five (5) days after the initial private conference with the superintendent." (Emphasis added.) Because (f) presupposes a conference with the superintendent before a conference with the governing body, it must flow from the statute's earlier statement of who has a right to a superintendent conference, which *doesn't* include teachers not renewed based on a reduction in force. So section 20-28-7.5-2 is like a flow chart: notification, a meeting with the superintendent for teachers non-renewed for any reason other than reduction in force, and then a meeting with the governing body after the superintendent meeting. Teachers not renewed based on a reduction in force branch off right after the notice requirement, and (f) doesn't apply to them.

Vukadinovich was not entitled under state law to a conference with the superintendent or the board. For this reason, the School's motion for summary judgment with respect to the state law due process claims is **GRANTED**.

Now we move to the federal constitutional due process question. Vukadinovich's briefing indicates that he does not believe that the reduction in force that led to his non-renewal was justified. But that's beside the point when considering questions of procedural due process. The issue is whether Vukadinovich had the necessary measure of *process*. The School says that it made a valid decision about what classes to offer for non-discriminatory reasons, which is its prerogative. The Seventh Circuit has been clear that schools should be afforded some measure of autonomy when their highly regulated sector leaves room for it:

> Judges must be sensitive to the effects on education of heavy-handed judicial intrusion into school disciplinary issues, or heavy-handed administrative intrusion required by judges interpreting Title IX and other statutes that, along with free-wheeling interpretations of the speech and religion clauses of the First Amendment, have made education one of the most heavily regulated American industries. Let us not forget that one component of academic freedom is the right of schools to a degree of autonomy in the management of their internal affairs.

*Doe v. St. Francis Sch. Dist.*, 694 F.3d 869, 873 (7th Cir. 2012) (citations omitted). That autonomy surely applies to deciding elective course offerings.

The Fourteenth Amendment doesn't by itself create a private right of action, but such actions can be brought through 42 U.S.C. § 1983.[4] A section 1983 claim requires the plaintiff to show that (1) the conduct was committed by a person acting under color of state law, and (2) the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Doe v. Smith*, 470 F.3d 331, 338 (7th Cir. 2006) (abrogated on other grounds). Under the Due Process Clause:

> [A] deprivation of life, liberty, or property [must] be preceded by notice and opportunity for hearing appropriate to the nature of the case. [The Supreme Court has] described 'the root requirement' of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest. This principle requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment.

*Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542 (U.S. 1985) (quotation marks, citations omitted).

In the context of public employment, this hearing requirement is an acknowledgment of the competing interests at play: the private interest in retaining employment, the governmental interest in the expeditious removal of employees the government has legitimate reason to remove, and the risk of an erroneous termination. *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 543 (1985) (citing *Mathews v. Eldridge*, 424

---

[4] Vukadinovich wants his 1983 claim to stand on its own (DE 292 at 22-25), but 1983 is just a way for a plaintiff to say "my rights were violated"; the plaintiff needs to connect 1983 to something else to explain *which* right was violated.

U.S. 319, 335 (1976)). The hearing need not be elaborate, and may be "something less" than a full evidentiary hearing. *Id.* at 545.

In this case, Vukadinovich had a hearing with Superintendent Kaiser. He had an opportunity to explain his side of the story, although based on Kaiser's deposition it sounds like he mostly asked her to justify the decision with hard numbers, and she declined to do that. There's no reason, everything else aside, that this meeting with the superintendent couldn't have been sufficient to qualify as the process that Vukadinovich was due. The superintendent had the power to consider the competing interests, to weigh them, and to reconsider the nonrenewal of Vukadinovich's contract if she heard something convincing.

But the underlying discrimination claim and its related issues throw a monkey wrench in the defendants' argument for summary judgment on the federal due process claim. As we saw with respect to the age discrimination claims, it may be that Biggs really made the non-renewal decision, and that the decisions of the superintendent and the School board were just formalities – that would be a reasonable inference to draw from Kaiser's deposition. She certainly didn't seem to have applied her own rigorous analysis to the situation. If the jury finds that Biggs terminated Vukadinovich for impermissible reasons, and that the hearing with Kaiser was a sham and a mere formality, then the hearing couldn't have satisfied due process requirements, even if Vukadinovich was permitted to tell his side of the story until he was blue in the face. "A hearing where the decisionmaker has prejudged the outcome does not comport with

due process because it effectively denies the employee the opportunity to respond to the accusations against him." *Powers v. Richards*, 549 F.3d 505, 512 (7th Cir. 2008) (citing *Ryan v. Ill. Dep't of Children & Family Servs.*, 185 F.3d 751, 762 (7th Cir. 1999) (collecting cases)).

The defendants' motion for summary judgment on the federal due process claim is therefore **DENIED**. However, this claim only implicates Biggs and Kaiser in their individual and official capacities, and the School through the official capacity claims. To the extent that it was alleged against the other defendants, summary judgment is **GRANTED** to those defendants.

### 3.      Other 1983 Claims

In order for a plaintiff to prevail on a section 1983 claim against a municipality (or an official capacity claim against an individual), a municipality decisionmaker must have been involved in the unlawful behavior, or the unlawful behavior must have been done pursuant to an unlawful policy, or practice so pervasive it has the force of policy. *See, e.g.*, *Estate of Sims v. Cnty. of Bureau*, 506 F.3d 509, 514-15 (7th Cir. 2007) ("In order to state a § 1983 claim against a municipality, the complaint must allege that an official policy or custom not only caused the constitutional violation, but was the moving force behind it. [] Unless there is an unconstitutional policy, there cannot be official-capacity liability; only individual-capacity liability is possible. The official policy requirement for liability under § 1983 is to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for

which the municipality is actually responsible." (internal quotation marks and citations omitted)); *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002). Vukadinovich's amended complaint alleges 1983 claims for both (1) a failure of training that led to improper process in his termination, and (2) a supposed general policy of lawlessness that included the conspiracy to terminate him. (DE 54 at 15-16.) Vukadinovich's response to the defendants' motion for summary judgment again discusses the failure to train the individual defendants on their constitutional duties. He identifies the problematic policy or custom a little more specifically, as one "to cause injuries to employees' public employment jobs," although this bleeds into the alleged unconstitutional acts of the individual defendants, and overlaps with the failure to train claim. (DE 292 at 22-25.)

These purported section 1983 claims address Vukadinovich's alleged wrongful termination and the related alleged violation of his due process rights, so these claims are redundant to the age discrimination and section 1983-due process claims (and are much more confusing and less well-formed). These claims also lack evidentiary support of unconstitutional policies. The defendants' motion for summary judgment on these attempts at stand-alone section 1983 claims are therefore **GRANTED**.

### 4.    Qualified Immunity

The defendants argue in their motion for summary judgment that they are entitled to qualified immunity. They apply this argument to the possibility that I might find that Vukadinovich did have a right to a meeting with the School board. If that were

the case, the defendants would have argued that such a right was not clearly established, and so they should be shielded from liability by qualified immunity. *See, e.g., Stinson v. Gauger*, Nos. 13-3343, 13-3346 & 13-3347, 2015 U.S. App. LEXIS 15002, at *19 (7th Cir., Aug. 25, 2015). We don't need to get to this argument, however, as I previously determined that the meeting with the superintendent was, at least in theory, sufficient to satisfy due process, and Vukadinovich did not have a constitutional right to a meeting with the board. This argument is therefore **MOOT**.

## OTHER MOTIONS

Several additional motions collateral to the motions for summary judgment are still pending. Most of these relate to the filing of additional evidence, or allegations of impropriety by Vukadinovich against the defendants. This case has become so caustic that the parties seem to be assuming the worst of one another. They ascribe nefarious motives where there aren't any, file whatever pops into their heads written out to the maximum page limits and beyond, and assume that particular conclusions that they have drawn are as plain as the nose on your face, when they are anything but.

I will handle this barrage on motions in summary fashion. First up is Defendants motion for leave to file excess pages in support of their motion for summary judgment. (DE 283.) Their brief came in at 29 pages, 4 more than the 25 pages prescribed by the Local Rules. There are several issues and voluminous evidence to address, and four excess pages seem reasonable, so I will allow them the extra pages. Their motion is

**GRANTED**. (DE 283.) Vukadinovich then asked, arguing tit for tat, for an additional 4 pages for his response. His motion is also **GRANTED**. (DE 291.)

The parties have submitted more than enough information for me to decide these motions on the papers, so Vukadinovich's motion for oral argument on his motion for partial summary judgment is **DENIED**. (DE 288.)

Vukadinovich's motion for leave to submit an inadvertently omitted exhibit (his own affidavit) is **GRANTED**. (DE 294.)

Vukadinovich compared type-settings and alleges that the defendants' brief in support of their motion for summary judgment is printed in too-small font size, per this District's Local Rules. I'm not sure this is true, but in any event, the remedy for formatting errors is to strike the paper, but only after giving the offending party an opportunity to fix it. That would result in even more filings on summary judgment, which is the last thing this case needs. So I will exercise my discretion and **DENY** Vukadinovich's motion to strike the defendants' brief in support of their motion for summary judgment. (DE 295.)

Vukadinovich's motion for leave to file a supplementary exhibit (an e-mail he received on September 1, 2014, from the office of the Speaker of the State House of Representatives in response to a query from Vukadinovich) (DE 296), to which the defendants object because it is very late and would require additional analysis and briefing (DE 297). The email in question contains secondhand information from an unidentified author of unspecified expertise who starts the one-sentence purported

statutory interpretation with the phrase "It sounds to me like . . . ." The author seems to have glanced at the statute and offered an off-the-cuff explanation; this is not the statement of a well-versed expert with special knowledge of the subject. It is still this Court's role to interpret the law. Discovery lasted a sufficient period to allow the parties to gather any evidence they deemed necessary. Summary judgment strategy and briefs are crafted with a particular universe of evidence in mind, and allowing the addition of brand new evidence – especially evidence of such a dubious nature — after summary judgment motions have been filed is inefficient. The Motion to Supplement the Record (DE 296) is therefore **DENIED**.

Vukadinovich's motion to strike the defendants' reply in support of their motion for summary judgment (DE 285, 298) on the ground that it is 16 pages instead of 15 is also **DENIED**. (DE 300.) There are 4 lines of text on the sixteenth page, and it merely urges the Court to grant the motion for summary judgment – this page may be ignored without losing any substance, so to the extant Vukadinovich is concerned about the fairness of giving the defendants four extra lines of text, I will ignore these lines.

Vukadinovich points out that the defendants, in their reply brief in support of their motion for summary judgment, suggest that certain affidavits that Vukadinovich filed and cited should be stricken. (DE 298 at 2-4.) One is Vukadinovich's own affidavit, which the defendants argue is conclusory and self-serving. One is the affidavit of Jeff Brooks, a former assistant principal. The defendants argue that Brooks's affidavit contains statements that are conclusory, argumentative, and speculative. Vukadinovich

opposes this request. (DE 301.) Vukadinovich is correct that, per L.R. 56-1(e), disputes about the admissibility of evidence should be addressed in a separate motion. I'm not going to dig through a party's briefing to figure out what motions they should have filed, and then address the request as if they did file a motion. The defendants' request is not a motion, and therefore requires no disposition.

Vukadinovich filed yet another motion for leave to submit a supplemental exhibit (DE 302, documents from a September 2014 school board meeting – evidence created several months after the close of discovery, and after summary judgment briefing was complete). The defendants oppose the motion. The motion is **DENIED**. As I noted in addressing his earlier motion to supplement the record, discovery must stop somewhere to allow both parties and the Court to address the same universe of evidence on summary judgment. To the extent additional, newly available information is relevant, Vukadinovich may seek permission to use it at trial, or may call witnesses to discuss its content.

Vukadinovich's third pending motion to file a supplemental exhibit (DE 303) is **DENIED** for the same reasons as the other two motions seeking to submit supplemental exhibits.

Vukadinovich also moved for sanctions for defendants' alleged conduct of concealing and withholding information during discovery. (DE 309.) He explains that, late in the case, he learned that there might be additional documents in a particular file. He asked defense counsel about them, and defense counsel promptly inquired of her

client. The documents were located, and most of them were copies of documents that had been produced throughout discovery. Vukadinovich faults the defense for not finding and sending all of these documents initially. Rather than sorting them into "new" and "already-produced" piles, defense counsel simply sent over the large packet of documents, along with a note saying that most of the documents in the file had already been produced. Vukadinovich faults defense counsel for this, too. Defense counsel also sent the documents directly to the plaintiff, but did not file them on the docket, as the Local Rules require parties to do when a *pro se* plaintiff is involved. *See* N.D. Ind. L.R. 26-2(a)(2)(A). The defendants oppose the motion for sanctions. (DE 313.)

The defendants' response describes information requests of various kinds that number in the hundreds - requests for production, interrogatories, public records requests, and deposition notices. Despite Vukadinovich's characterizations, it appears to me from the record that the defendants have diligently attempted to provide the requested information, and when the file in question here was missed, they located it immediately once counsel was notified. It appears debatable whether some of the documents in the new file at issue were responsive to any of Vukadinovich's information requests, and that is an issue that would have to be addressed through discovery motions, not by jumping straight to sanctions. I don't see any evidence of malfeasance, even if there was sloppiness. In any event, I won't jump straight to sanctions.

The Court may sanction a party for disobeying a discovery order. Fed. R. Civ. P. 37(b)(2)(A)(vi); *see also*, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991); *Barnhill v. United States*, 11 F.3d 1360, 1367-68 (7th Cir. 1993).; *see also*, *Domanus v. Lewicki*, 742 F.3d 290, 301 (7th Cir. 2014). The Court must carefully analyze the situation to apply sanctions proportionate to the misconduct, and should consider "the frequency and magnitude of the party's failure to comply with court deadlines, the effect of these failures on the court's time and schedules, the prejudice to other litigants, and the possible merits of the" party's position. *Rice v. City of Chicago*, 333 F.3d 780, 784 (7th Cir. 2003) (citation, quotation marks, brackets omitted).

Any problems in this case appear to me to be the result of error, not willful misconduct, and sanctions are plainly not appropriate. Vukadinovich now appears to have all of the information he requested, and he has it before trial. Vukadinovich's motion for sanctions is therefore **DENIED**. (DE 309.)

## CONCLUSION

For the foregoing reasons, Plaintiff Vukadinovich's motion for partial summary judgment on the due process issue is **DENIED**. (DE 279.) Defendants' motion for summary judgment (DE 285) is **DENIED** with respect to the ADEA and retaliation claims against the School but **GRANTED** with respect to the individual defendants; **GRANTED** with respect to the state statute and contract claims; **DENIED** with respect to the constitutional Due Process claims (it only applies as against Biggs and Kaiser in their individual and official capacities, and the School through the official capacity

claims); and **GRANTED** with respect to the attempts at stand-alone section 1983 claims (sounding in a failure to train and implementing an unconstitutional policy).

The various other pending motions are disposed of as follows, with further explanation in the body of this Order: the defendants' motion for leave to file excess pages in support of their motion is **GRANTED.** (DE 283.) Vukadinovich's motion to file excessive pages is also **GRANTED**. (DE 291.) Vukadinovich's motion for oral argument on his motion for partial summary judgment is **DENIED**. (DE 288.) Vukadinovich's motion for leave to submit an inadvertently omitted exhibit (his own affidavit) is **GRANTED**. (DE 294.) Vukadinovich's motion to strike the defendants' brief in support of their motion for summary judgment is **DENIED**. (DE 295.) Vukadinovich's motion for leave to file a supplementary exhibit (an e-mail he received on September 1, 2014) is **DENIED**. (DE 296.) The defendants' request in their reply in support of their motion for summary judgment that two of Vukadinovich's affidavits be stricken is not a motion, and therefore requires no disposition. (DE 298 at 2-4.) Vukadinovich's motion to strike the defendants' reply in support of their motion for summary judgment is **DENIED**. (DE 300.) Vukadinovich's motion for leave to submit (another) supplemental exhibit (DE 302, documents from a September 2014 school board meeting – evidence created several months after the close of discovery, and after summary judgment briefing was complete) is **DENIED**. (DE 302.) Vukadinovich's third opposed motion to file a supplemental exhibit is **DENIED** for the same reasons as the other two pending

motions seeking to submit supplemental exhibits. (DE 303.) Vukadinovich's motion for sanctions is **DENIED**. (DE 309.)

The dates for trial and the final pretrial conference were vacated in a previous order (DE 323), and no new date was set then. THEREFORE the Court hereby sets a telephonic status conference for **October 15, 2015** at **1:30PM** Central/Hammond time. My case manager will call the *pro se* plaintiff at the number listed on the docket sheet and first attorney listed on the docket for the defendant, unless otherwise indicated at least 24 hours in advance of the call.

**SO ORDERED.**

ENTERED: September 14, 2015

/s/ Philip P. Simon
**PHILIP P. SIMON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**